IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ELAINE FRANCES VILIMEK,
    Plaintiff,

vs.                                Case No.: 5:10cv269/RH/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
    Defendant.
_____/

## REPORT AND RECOMMENDATION

    This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

    Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.    PROCEDURAL HISTORY

    Plaintiff filed her application for DIB on February 4, 2006, and alleged disability beginning March 24, 2005 (Tr. 71).[1] Her application was denied initially and upon reconsideration (*id.*). On July 31, 2009, following a hearing, an administrative law judge ("ALJ") found Plaintiff "not

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on February 15, 2011 (Doc. 15). Moreover, the page numbers refer to those found on the lower, right corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

disabled" (Tr. 71–80). The Appeals Council subsequently denied Plaintiff's request for review (Tr. 1–5). Thus, the decision of the ALJ stands as the final decision of the Commissioner, now subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

II.  FINDINGS OF THE ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1) Plaintiff meets the insured status requirements of the Act through June 30, 2009.[2]

2) Plaintiff has not engaged in substantial gainful activity since March 24, 2005.

3) Plaintiff has the following severe impairments: status post hydrocephalus, with placement of shunt; status post spinal fusion at L4-L5; status post total right hip replacement; arthritic changes at L3-L4; status post melanoma of the left medial leg; and hypertension and hypothyroidism, both controlled with medication.

4) Plaintiff has no impairment or combination of impairments that meets or medially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5) Plaintiff has the residual functional capacity ("RFC") to perform sedentary work.[3]

6) Plaintiff is able to perform her past relevant work as a customer service manager and communications manager, because this work does not require the performance of work-related activities precluded by her RFC; she therefore is not disabled.

III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan,

---

[2] Thus, the time frame relevant to this appeal is March 24, 2005 (alleged onset) through June 30, 2009 (date last insured).

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her/his previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), a disability claim is analyzed in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve

months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

    4.    If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

    5.    Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

    A.    Personal and Employment History

Plaintiff was born on September 1, 1952, and thus was fifty-two years old on the date she alleges she became disabled (Doc. 21 at 3). Plaintiff completed high school and attended approximately one year of college (Tr. 16). She is five feet, seven inches tall and, at the time of her hearing in March 2009, weighed 238 pounds (Tr. 13–14).

Plaintiff testified at her hearing before the ALJ that she began working for AT&T in Chicago, Illinois, in approximately 1980. She described the various managerial and/or supervisory positions during her more recent employment with AT&T as follows: operations manager (1991–93), sales operations planner (1994–96), and customer care manager (1996–98) (Tr. 18–20). She also described the physical requirements of these positions (*see* Tr. 22–23). Additionally, Plaintiff testified she was an independent contractor for AT&T in 1998 and 1999 and worked in positions similar to two positions she previously held (Tr. 24). Plaintiff moved to Florida and thereafter held jobs as a cashier and merchandiser/stocker, but she left those jobs due to back pain (Tr. 25–26, 28–29). Plaintiff testified she is unable to work due to back pain and severe depression

(Tr. 29).  She stated her depression is the most debilitating of all of her impairments, and it causes difficulty breathing and being around people (Tr. 29–30).

  B.  Relevant Medical History

    1.  Physical

On April 27, 2005, Plaintiff presented to Robert P. Feldman, M.D., a neurosurgeon, with a chief complaint of hydrocephalus (Tr. 647).  His report provides a helpful overview of Plaintiff's history, as follows:

> [Plaintiff] is a 52-year-old female with a history of hydrocephalus, hypertension, hypothyroidism and VP [ventriculoperitoneal] shunt placement who reports that approximately seven years ago she began to develop severe headaches.  This eventually progressed to include incontinence and falls and memory difficulties.  She was diagnosed with hydrocephalus and a VP shunt was placed in January of [20]01 without complication.  This was a right occipital shunt.  Following the shunt placement, she had dramatic improvement of her symptoms.  She was doing quite well until 3/25/05 when she did a lifting movement and developed severe low back pain. This prompted a visit to the emergency room where steroids and muscle relaxants and pain medications were given.  Her symptoms have improved, but have not vanished.  Since then, she's noticed problems with stomach pain with a lot of gas, headache, [and] light sensitivity, but denies constipation, or incontinence, or gait problems.  Based on the above, she was concerned about a shunt problem and, therefore, underwent a CAT scan and some skull x-rays and then was referred to me for neurosurgical evaluation.

(*id.*).

Dr. Feldman subsequently opined that the VP shunt was functioning within normal limits and that Plaintiff's headaches were unrelated to the shunt (*see* Tr. 646).  He therefore referred Plaintiff to her primary care physician for her gastrointestinal concerns (*id.*).  He also expressed concern about a statement by Plaintiff's husband that suggested he wished to solicit Dr. Feldman's assistance with a claim for disability by Plaintiff (*id.*).  Dr. Feldman stated he would have "nothing to do with disability paperwork or [Mr. Vilimek's] attempts to obtain disability for his wife," and he noted "there may be some secondary gain issues" since Plaintiff's shunt was "functioning fine" (*id.*).

On November 18, 2005, Plaintiff presented to Gus Arriola, M.D., and reported continued back pain since the March 2005 incident (as described in Dr. Feldman's report) (Tr. 259).  Dr. Arriola noted that Plaintiff had no radicular component to her back pain and no numbness, tingling,

or paresthesias in the lower extremities, except mild numbness of the right great toe (*id.*). Additionally, Plaintiff's gait was normal, with good heel and toe walking, and her strength was full ("5/5"), with no evidence of muscle wasting or atrophy (Tr. 260). Dr. Arriola noted that an MRI obtained in November 2005 revealed findings consistent with a central disc herniation at L3-L4 (Tr. 259). He opined that Plaintiff was not a good surgical candidate, as she could be successfully treated with an aggressive rehabilitation program and physical therapy (*see* Tr. 260). He prescribed Voltaren and advised Plaintiff that weight reduction would be beneficial (*id.*).

On February 24, 2006, Plaintiff saw Thomas M. Fox, D.O., an orthopedic surgeon, with complaints of bilateral knee pain and mild lower extremity weakness (Tr. 262). Plaintiff stated her problems had begun approximately five weeks earlier after she fell at home and possibly twisted her left knee (*id.*). An examination revealed mild knee guarding, slight tenderness to palpation, and mild crepitus but no obvious effusion or instability (*id.*). X-rays of both knees revealed early degenerative changes, and Dr. Fox assessed bilateral early degenerative joint disease (*id.*). He administered knee injections and counseled Plaintiff about weight reduction and non-weight bearing exercise (Tr. 262–63).

On May 4, 2006, Plaintiff presented to Jaime A. Foland, M.D., with complaints of back pain (Tr. 265). Following an examination Dr. Foland assessed "chronic low back pain due to what appears to be ligamentis sprain of the lower lumbar spine and possibly due to left sacroiliac joint sprain" (Tr. 266). He opined that Plaintiff's pain was unrelated to the disc herniation at L3-L4, as seen on the previous MRI (*id.*). Dr. Foland also noted that Plaintiff never filled Dr. Arriola's prescription for Voltaren but instead began using ibuprofen and "most recently Lortab" (Tr. 265). Dr. Foland administered para-vertebral injections and advised Plaintiff to continue using Lortab—but to avoid ibuprofen—and return in one week for a second set of injections (*see* Tr. 266). Plaintiff returned on May 12 and reported "significant improvement" with the injections, noting that she took Lortab for only one or two days following the injections and was planning to go on a vacation (Tr. 264). Dr. Foland administered a second set of injections and advised Plaintiff to return for a third set in one week, before going on vacation (*id.*). He noted that Plaintiff was with her husband, who stated that Plaintiff was "currently applying for social security disability" (*id.*). Plaintiff returned for the third set of injections on May 18, 2006 (Tr. 268). She next returned on June 30, 2006, and stated she had traveled to Chicago and Miami, and was doing well until about

two to three days earlier after standing "a long time" (Tr. 267). Plaintiff reported at this final visit that the injections "do help," that she had not been taking pain medication, and that she had been taking water aerobics classes five days per week for three weeks (*see id.*).

On August 23, 2006, Plaintiff was treated at the Twin Cities Hospital following a motor vehicle accident (Tr. 427–28). She apparently fractured both feet and the proximal phalanx of the right great toe (*id.*). Dr. Fox performed a closed reduction with pin fixation on the right toe (*id.*).

Plaintiff returned to Dr. Arriola in May 2007 and stated she wanted no more injections from Dr. Foland because they were not working (Tr. 456). Dr. Arriola ordered a lumbar discogram, myelogram, and post-myelogram CT (*see* Tr. 450–51, 453–56). The tests revealed a small subligamentous herniation at L4-L5 (Tr. 455). On June 22, 2007, Dr. Arriola met with Plaintiff to discuss the test results and treatment options, including surgery (and the potential risks, benefits, and complications of certain surgical procedures) (*see* Tr. 449). Plaintiff elected to proceed with a right transforaminal lumbar interbody fusion with facetectomy at L4-L5 (Tr. 431, 449). The surgery was performed on July 12, 2007, and just after the surgery the fusion "appear[ed] good" (Tr. 429, 431, 434). Plaintiff was discharged on July 14. The discharge summary reflects that she did "extremely well" postoperatively, was ambulatory on the first postoperative day, was off her patient-controlled analgesia pump on the second postoperative day and wanted to go home; she was ambulatory, able to climb stairs, and able to tolerate a regular diet (Tr. 430). On July 18, Plaintiff saw Dr. Arriola, who noted that Plaintiff continued to do "very well" postoperatively and was ambulatory and tolerating a regular diet (Tr. 429). Plaintiff reported using Lortab for pain and getting "around quite nicely" with the Lortab (*id.*). Her wounds were well healed with no undue redness, no drainage, and minimal swelling, and she displayed no evidence of paravertebral muscle spasm and no trigger points in the lower lumbar region (*id.*). On July 31, Dr. Arriola reported, "Since her last visit on July 18, 2007, [Plaintiff] continues to improve. She has been more active. Her back pain is easing up. She has had no further radicular pain. She is down to taking about 2 or 3 Lortab q.d. and she is requesting we go down from the 10 mg to something a little milder. We are going to switch her to Lortab 7.5 mg." (Tr. 443). Dr. Arriola observed no swelling or trigger points but noted a minimal amount of muscle tightness in the paraspinal musculature, just above the wound (*id.*).

An MRI obtained on August 22, 2007, revealed the following: "(1) L4-5 discectomy and posterior fusion. The imaging appearance is excellent. (2) Degenerative changes otherwise are seen

virtually involving the L2, L3 and L5 facets, but no other defined pathology is seen." (Tr. 442). On August 31, 2007, Dr. Arriola advised Plaintiff that recent imaging revealed "excellent position of the appliance and the spacer" (Tr. 441). Plaintiff reported that she continued to do well and had exercised in a pool, walked more, felt better, and experienced no radicular pain, although she noted some axial low back pain, particularly with twisting (*id.*). Plaintiff displayed some minor muscle tightness and trigger point tenderness, but her strength was full, sensory was intact, and deep tendon reflexes were 2+ and equal bilaterally (*id.*). Examinations in October and November 2007 were generally the same, and at these visits Dr. Arriola noted Plaintiff's continued improvement (*see* Tr. 438, 440). Finally, a December 2007 MRI revealed that Plaintiff was status post fusion with an artifact disc in place and good postoperative appearance (Tr. 437). Additionally, arthritic changes at L3-L4 were observed, as well as possible scar formation (*id.*).

Plaintiff apparently underwent hip replacement surgery by Dr. Fox in early December 2007, as mention of the surgery is made in some of Plaintiff's records (*see* Tr. 438, 465, 499).[4] One such record reflects that Plaintiff was "doing well" just two days after the surgery (*see* Tr. 465). Plaintiff also reported in October 2008 that she was "doing well" with regard to back pain (Tr. 462).

Also in October 2008 a suspicious mole was removed from Plaintiff's left ankle (Tr. 460). She was subsequently diagnosed with malignant melanoma, and her primary care physician, Calvin Blount, Jr., M.D., referred her to a specialist (Tr. 457–58). Plaintiff was then evaluated by Adam I. Riker, M.D., an oncologist (Tr. 499–500). He scheduled and performed an excision of the mild melanoma (Tr. 498, 500).

Finally, Dr. Blount treated Plaintiff between 2005 and 2008 for a variety of physical ailments as her primary care physician (*see* Tr. 309–354; 457–97). He often characterized Plaintiff as "overweight," and he recorded her weight as ranging from approximately 232 pounds to 266 pounds during the course of his treatment (*see, e.g.*, Tr. 470, 473, 484, 489).

2.  Mental

Following Plaintiff's shunt placement in 2001, but before the date she alleges she became disabled, Plaintiff was treated at West Suburban Neurosurgical Associates, S.C., in Hinsdale, Illinois

---

[4] There are no surgical records or other records in the file that actually document the surgery.

(Tr. 388–417). The treatment records reflect Plaintiff's complaints of depression and prescriptions for antidepressant medications, such as Effexor and Lexapro (*see, e.g.*, Tr. 389, 392, 394). After Plaintiff moved to Florida, she saw neurologist Billy C. Weinstein, M.D. On March 17, 2005, Dr. Weinstein noted that Plaintiff was taking Effexor for depression, and he described her mental status as "normal" (Tr. 421, 419). Additionally, Plaintiff presented to an emergency room on three occasions in 2005 with complaints of back pain, and on each occasion her psychiatric condition was described as normal (*see* Tr. 234, 244, 252).

From May 2005 through 2008, Dr. Blount—who, as noted *supra*, primarily treated Plaintiff for physical ailments—also diagnosed "major depression, recurrent episode, mild" and prescribed antidepressant medications, such as Effexor and Cymbalta, throughout the course of Plaintiff's treatment (*see, e.g.*, Tr. 310, 354, 475, 476, 484, 486). He also consistently noted that Plaintiff displayed appropriate affect and demeanor (*see, e.g.*, Tr. 316, 347, 352, 458, 468, 475, 479, 480, 484, 491), as well as normal speech patterns and "grossly normal memory" (Tr. 327, 339, 354). In June 2005, Dr. Blount noted that he concurred with a recommendation that Plaintiff undergo a psychiatric consultation for her depression and for "medical management" (Tr. 351–52).[5] In October 2005, Plaintiff denied frank depression, and in December 2005, she reported "doing well" on Effexor (Tr. 326, 318). In May 2007 Plaintiff advised Dr. Blount that Effoxor did not seem to be working because she was "still depressed" and did not "want[] to socialize much"; when Plaintiff's medication regimen was adjusted to include Cymbalta, however, she reported improvement within three weeks and stated she was "getting out more" (Tr. 481, 483). In October 2008, Plaintiff reported worsening symptoms of depression, as well as anxiety and "anxiety attacks," but Dr. Blount's assessment remained the same (i.e., major depression, recurrent episode, mild) (Tr. 462–63). Dr. Blount did add Pristiq to Plaintiff's medication regimen, and Plaintiff reported in November 2008 that it was "working well," her mood was "much improved," and she felt the best she had felt in years, noting she was sewing and "laughing again" (Tr. 457).

---

[5] The file contains no evidence that Plaintiff obtained the recommend psychiatric consultation. Although Plaintiff saw a psychologist nearly two years later, and a psychiatrist nearly four years later, she did so upon referral by the ALJ (*see* Tr. 368, 503).

At the request of the Division of Disability Determinations, Plaintiff underwent a consultative psychological evaluation by Dr. Robert Kline on March 26, 2007 (Tr. 368–71). Plaintiff advised Dr. Kline that her depression had begun twenty years earlier and that she has since had two nervous breakdowns (Tr. 368). She reported being forgetful, limiting her social contact to only her husband, and preferring to be alone (Tr. 369). Plaintiff also stated that she was taking Effexor and that it was "extremely helpful" initially but presently was not as helpful or effective (*see* Tr. 369). Dr. Kline noted that Plaintiff's speech was spontaneous, of normal rate and tone, well articulated, and easily understood (Tr. 370). Additionally, Plaintiff appeared to understand commands, comments, and questions without difficulty; her thought expression was rational and logical; she exhibited no loosening associations, rambling speech, or delusional thinking; her verbal structure was logical and relevant; she attended the interview without distraction or a decline in attention; she easily spelled the word "world" forward and backward without hesitation or error; she was fully oriented; and she neither reported nor exhibited hallucinations or perceptual disturbances (*id.*). Dr. Kline observed that Plaintiff's mood expression was moderately depressed during the interview, that she exhibited some memory deficits, and that a "significant history was revealed of protracted and cyclical periods of depression and anxiety" (*id.*). He assessed major depressive disorder, recurrent, severe; panic disorder, without agoraphobia; and a Global Assessment of Functioning Score ("GAF") of 60[6] (*id.*). Dr. Kline based his diagnoses, in part, on Plaintiff's reports of depressed mood, lethargy, anhedonia, social isolation, sleep and appetite disturbances, and passive suicidal ideation, coupled with her reports of long-term treatment with psychotropic medications and repeated attempts at psychotherapeutic intervention (*id.*). Dr. Kline also noted that Plaintiff's description of her panic attacks and related symptoms was consistent with what is known about a valid panic attack experience, such as breathing difficulty, sweating, shortness of breath, and feelings of being "frozen" or in intense fear (Tr. 371). Dr. Kline recommended that Plaintiff be

---

[6] GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994) (the "DSM-IV"). It may be expressed as a numerical score. *Id.* at 32. A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Case No. 5:10cv269/RH/EMT

referred for a psychiatric and psychotherapeutic evaluation, and he opined that if Plaintiff was awarded benefits she would have "little difficulty" managing funds (*id.*).

On April 7, 2009, Plaintiff underwent a consultative psychiatric evaluation by John L. Laubenthal, M.D. (Tr. 503). Plaintiff and her husband reported that she was chronically depressed and frequently anxious and that she could not be around people or remember things, such as directions (*id.*). Plaintiff stated her depression started twenty to twenty-five years earlier, after which she experienced "a couple of nervous breakdowns" and, as a result, had to quit her employment at that time (*id.*). She noted she most recently stopped working, in approximately 2005, "initially" due to back pain. She stated, however, that surgery helped her back pain "to some degree," and she was presently unable to work primarily because of her emotional state (*id.*). Dr. Laubenthal assessed major depression, recurrent, moderate to severe; panic disorder "with our without [sic]" agoraphobia by history; attention deficit disorder, not otherwise specified ("NOS"), by history; and cognitive disorder, NOS, by history (Tr. 504). He advised Plaintiff to reduce her intake of Cymbalta and return in one week (*id.*). Plaintiff returned on April 14, 2009, and reported being more anxious since reducing the Cymbalta (Tr. 502). Dr. Laubenthal assessed major depression and panic disorder, and he advised Plaintiff to return in one week (*id.*).[7] Dr. Laubenthal noted that he spent most of the April 14 session filling out disability paperwork for Plaintiff (i.e., a Medical Source Statement ("MSS") regarding Plaintiff's functional abilities) (*id.*). On the MSS, Dr. Laubenthal opined that Plaintiff has numerous psychiatric signs and symptoms, as well as marked functional limitations, and that she would miss more than three days of work per month as a result of her impairments (*see* Tr. 506–09). In explaining his opinions, Dr. Laubenthal noted in part that Plaintiff "has [a] long history of severe, treatment resistant depression & presents [with] ongoing mod[erate]/severe anxiety/depression" (Tr. 507). He also opined that Plaintiff's condition and limitations have "existed and persisted" since 2002 (Tr. 510).

Finally, two non-examining agency psychologists completed Psychiatric Review Technique forms ("PRTFs"). The first PRTF was completed on September 29, 2006, by Mercedes DeCubas, Ph.D. (Tr. 287). Dr. DeCubas concluded that Plaintiff has no severe mental impairment (*id.*). She

---

[7] Plaintiff did not return.

evaluated Plaintiff's psychiatric condition under Section or "Listing" 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Affective Disorders*) and found that although Plaintiff suffers from a medically determinable impairment (major depression), the impairment does not satisfy the diagnostic criteria of Listing 12.04 (Tr. 287, 290). She further opined that Plaintiff's depression causes mild restrictions in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and she has no extended episodes of decompensation (Tr. 297). In support of her opinions Dr. DeCubas noted—in relevant part—that Plaintiff has no history of psychiatric treatment, her antidepressant medication is prescribed by her primary care physician, the medication controls her condition, Plaintiff failed to follow up with a recommended psychiatric consultation, and Plaintiff stopped working because of physical, not mental, problems (Tr. 299). Wendy Silver, Psy.D., the other agency psychologist, completed a PRTF on March 29, 2007 (Tr. 374–87). She opined that Plaintiff has two medically determinable impairments (major depressive disorder, recurrent and mild to severe and panic disorder), but neither was severe nor met the criteria of Listing 12.04 or 12.06 (*Anxiety-Related Disorders*) (Tr. 374, 377, 379). Dr. Silver, as with Dr. DeCubas, assessed no more than mild functional limitations, with no extended episodes of decompensation (Tr. 384). In explaining her opinions, Dr. Silver listed many of the same reasons as Dr. DeCubas (*see* Tr. 386). Dr. Silver also considered Dr. Laubenthal's examination (*id.*).

V.   DISCUSSION

Plaintiff raises two issues in the instant appeal. Plaintiff contends the ALJ erred: (1) in failing to find her depression severe at step two; and (2) in failing to account for her obesity and its effect on her impairments (Doc. 21 at 1).

A.   Depression

At step two of the sequential evaluation process, a claimant must prove that she is suffering from a severe impairment or combination of impairments, that have lasted (or must be expected to last) for a continuous period of at least twelve months, and which significantly limit her physical or mental ability to perform "basic work activities." *See* 20 C.F.R. §§ 404.1509, 404.1520(c) 404.1521(a). Basic work activities include mental functions such as understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting (as well as physical functions not at issue here). 20 C.F.R. § 404.1521(b). An impairment can be considered

non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Bowen v. Yuckert, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account"). Although the claimant carries the burden at step two, the burden is mild. McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ( "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected."). A claimant need only show that "her impairment is not so slight and its effect is not so minimal." *Id.*

The regulations mandate specific procedures for the evaluation of mental impairments. *See* 20 C.F.R. § 404.1520a and 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 *et seq*. Listing 12.00 addresses various potentially disabling mental impairments and instructs that the listing for each impairment begins with a narrative statement describing the disorder. Listing 12.00 then requires evaluation of two sets of criteria known as the "Paragraph A" and "Paragraph B" criteria. Paragraph A criteria relate to medical findings. Paragraph B criteria address impairment-related functional limitations in four broad functional areas: activities of daily living; social functioning; concentration, persistence and pace; and repeated episodes of decompensation. *See* Listing 12.00C. Generally, a mental impairment is deemed non-severe at step two if the degree of limitation in the first three functional areas is "none" or "mild," and the degree of limitation in the fourth area is "none," "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Here in determining that Plaintiff's mental impairments do not meet or equal the criteria of Listing 12.04 or 12.06, the ALJ considered the Paragraph B criteria of those listings (Tr. 77). He noted, correctly, that to satisfy the Paragraph B criteria, Plaintiff's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration (Tr. 77; *see also* Listings 12.04, 12.06). He then found that the Paragraph B criteria are not satisfied—and, correspondingly,

that Plaintiff has no severe mental impairment—because Plaintiff has mild restrictions in the first three areas and no episodes of decompensation in the fourth area (Tr. 77).

The ALJ largely based his Paragraph B findings on the opinions of the non-examining agency psychologists, as contained on the PRTFs, as well as the opinions of Dr. Kline (Tr. 76, 79). Plaintiff asserts that the ALJ's findings are not supported by Dr. Kline's opinions.

Initially, as Plaintiff concedes, the ALJ's Paragraph B findings are fully supported by the opinions of the agency psychologists.[8] As to Dr. Kline's opinions, Plaintiff asserts that they conflict with the ALJ's findings because Dr. Kline assessed a GAF score of 60 and, therefore, "felt that [Plaintiff] was suffering *more than mild* limitations from her depression but rather *moderate* limitations" (Doc. 21 at 15) (emphasis in original). Plaintiff's argument is unpersuasive. First, "moderate" limitations do not satisfy the Paragraph B criteria. *See* Listings 12.04B., 12.06B. (requiring marked limitations); *see also* Listing 12.00C. (explaining that in assessing the severity of a mental impairment, "marked" means "*more than moderate* but less than extreme") (emphasis added). Thus, the GAF score assessed by Dr. Kline, which corresponds with "moderate symptoms," does not satisfy the Paragraph B criteria of the listings. Second, a GAF score, without evidence that it impaired the ability to work, does not establish an impairment. *See* Camp v. Barnhart, 103 Fed. Appx. 352, 354 (10th Cir. 2004). The GAF scale is intended for use by practitioners in making treatment decisions, *see* DSM-IV at 32–33, and neither the Regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score. In fact, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." *See* 65 Fed. Reg. 50746–01, 50764–65, 2000 WL 1173632 (August 21, 2000). Accordingly, the ALJ did not err in concluding that the Paragraph B criteria are not satisfied.

Plaintiff also contends the ALJ erred by picking and choosing only those parts of Dr. Kline's report that support a finding of "not disabled," and dismissing those parts that support a finding of

---

[8] As noted *supra*, Dr. DeCubas and Dr. Silver both imposed, at most, mild functional restrictions and noted no episodes of decompensation; they also referenced portions of the record in support of their opinions (*see* Tr. 299, 386), which portions fully support their opinions.

Case No. 5:10cv269/RH/EMT

"disabled" (Doc. 21 at 15). In support, Plaintiff points to the ALJ's characterizing Dr. Kline's depression diagnosis as "major depressive disorder, recurrent," instead of "major depressive disorder, recurrent, severe" (*id.* at 15–16). The ALJ's omission of the word "severe," Plaintiff contends, demonstrates that he "was trying to downplay the severity of [her] depression" (*id.*). Again, Plaintiff's contention is unavailing. First, the ALJ's statement was a direct quote from Dr. Kline's report. In the "diagnostic impressions" section of his report, Dr. Kline assessed "major depressive disorder, recurrent, severe" and "panic disorder, without agoraphobia" (Tr. 370). In the "prognosis" section, however, Dr. Kline stated, "based on the immediate evaluation, it is believed that [Plaintiff] meets diagnostic criteria for both a major depressive disorder, recurrent and for panic disorder, without agoraphobia" (Tr. 370). The ALJ simply repeated, nearly verbatim, Dr. Kline's statement from the prognosis section of his report (*compare* Tr. 76 *with* Tr. 370). In doing so, the ALJ did not intentionally downplay the severity of Plaintiff's depression, especially considering that the ALJ specifically mentioned in his opinion Dr. Laubenthal's diagnosis of "major depression, recurrent, moderate to severe" (Tr. 77).[9]

Even if the ALJ erred, however, by mischaracterizing Dr. Kline's diagnosis, the error is harmless. Dr. Kline's including the word "severe" in his diagnosis does not compel a finding that Plaintiff's depression is "severe," because the Commissioner "will not give any special significance to the source of an opinion on issues reserved for the Commissioner." 20 C.F.R. § 404.1527(e)(3). Moreover, Dr. Kline's diagnosis of "major depressive disorder, recurrent, severe" does not correspond with a finding that Plaintiff's major depressive disorder is "severe," as that term is defined in the Regulations. To require the Commissioner to accept as controlling a psychologist's statement that a condition is or is not severe would require the Commissioner to credit the psychologist not only with knowledge of the patient's mental condition, but also with an understanding of the nuances of how the regulations analyze the severity of mental impairments.

Here, the ALJ followed the mandates of the Regulations in evaluating Plaintiff's mental impairments. Moreover, his findings are supported by substantial evidence on the record as a whole, including the opinions on the PRTFs, the opinions of Dr. Kline, and other evidence in the record

---

[9] Plaintiff does not challenge the ALJ's decision to discount the restrictive opinions assessed by Dr. Laubenthal.

(e.g., the evidence referenced by Dr. DeCubas and Dr. Silver in support of their opinions; the treatment records from Dr. Blount—Plaintiff's primary care provider and long-term treating physician who prescribed and managed her antidepressant medication—that reflect consistent and repeated diagnoses of "major depression, recurrent episode, <u>mild</u>," as well as observations of a normal mental status, and the imposition of no functional restrictions). For all these reasons, Plaintiff is not entitled to relief on this claim.

     B.    Obesity

In her other claim for relief, Plaintiff asserts as follows: "Despite the fact that [Plaintiff's] treating physicians repeatedly listed obesity in their treatment notes, the ALJ did not find obesity to be a severe impairment nor did he adequately evaluate this impairment in combination with her other impairments as required" by Social Security Ruling ("SSR") 02-01p (Doc. 21 at 16). The undersigned concludes that the ALJ committed no error in this regard.

Obesity is recognized by the Regulations as "a medically determinable impairment that is often associated with disturbance of the musculoskeletal system . . . [which] can be a major cause of disability . . . ." 20 C.F.R. § 404, Subpt. P, App. 1, § 1.00Q. However, obesity is not itself a listed disability, nor is it defined in the Regulations. SSR 02-01p provides that when establishing the existence of obesity as a medically determinable impairment, "we will generally rely on the judgment of a physician who has examined the claimant and has reported his or her appearance or build, as well as height and weight." SSR 02-1p(4) (2002). It further provides, "As with any other medical condition, we will find that obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02-1p(6)

At the outset, the undersigned notes that Plaintiff did not allege disability based on obesity. In the Disability Report filed in connection with her DIB application, Plaintiff alleged disability on the basis of "herniated disk in back, inflamed ligaments, [and] depression" (Tr. 139–40). *See, e.g.*, <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001) ("The fact that [claimant] did not allege [a particular impairment] in her application for disability benefits is significant, even if the evidence of [the impairment] was later developed."). Similarly, Plaintiff reported that she discontinued working due to back pain (Tr. 140, 317) and/or depression (Tr. 29–30, 503). And, although she

testified as to her height and weight at her hearing (Tr. 13–14), she did not claim she was unable to work or otherwise limited due to being overweight. Moreover, she did not testify that her weight had increased significantly, if at all, since the time she performed her past relevant work (which work, the ALJ found, she could return to). In short, Plaintiff did not alert the ALJ that her obesity was a disabling impairment. *See* Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (ALJ is under no "'obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability'") (quoting Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993)); *see also* 20 C.F.R. § 404.1512 (requiring that a claimant "bring to our attention everything that shows that you are . . . disabled"). Likewise, Plaintiff raised no obesity-related claim in seeking review by the Appeals Council (*see* Tr. 227–28). Thus, the instant claim may, in all likelihood, be properly denied on this basis alone.

Even if the merits of Plaintiff's claim are considered, however, she is not entitled to relief. Plaintiff contends she qualifies as obese based on treatment records that repeatedly characterize her as "overweight or obese" (*see* Doc. 21 at 16–17). The records cited by Plaintiff, however, describe her as "obese" on only one occasion by a physician who did not record Plaintiff's height or weight and who saw Plaintiff on a limited and short-term basis only (i.e., in relation to a possible problem with the shunt placement) (*see* Tr. 647–48).[10] The remaining notations, all of which are included in Dr. Blount's treatment records, characterize Plaintiff simply as "overweight," not obese (*see* Doc. 21 at 16–17 (citing Tr. 468, 470, 473, 475, 479, 484, 489)).[11] Moreover, Dr. Blount's records do not note Plaintiff's "appearance or build," as required by SSR 02-1p(4).

Alternatively, or additionally, Plaintiff contends she qualifies as obese based on her body mass index ("BMI") (*see* Doc. 21 at 16–17). More specifically, Plaintiff states her BMI is 38.4, as calculated by her attorney based on Plaintiff's testimony that she is 5'6" tall and weighs 238 pounds, which BMI makes her obese (Doc. 21 at 16). Even if the BMI (or treatment records) sufficiently

---

[10] This one diagnosis is, alone, insufficient to establish that the condition is severe. *See, e.g.*, Salles v. Comm'r. of Social Security, 229 Fed. Appx. 140, 145 (3d Cir. 2007) (diagnoses alone, including diagnosis of depression, insufficient to establish severity at step two).

[11] Plaintiff additionally cites transcript page 499, but Plaintiff's weight is not characterized on that page as obese, or overweight, or in any other manner, although her weight is noted on that page as 243 pounds (*see* Doc. 21 at 16–17; Tr. 499).

establishes Plaintiff's obesity as a medically determinable impairment, the evidence falls far short of establishing that it is a severe impairment.

Plaintiff has pointed to no evidence in the record suggesting that her obesity causes work-related limitations beyond those accounted for in her assigned RFC. Similarly, Plaintiff has not pointed to, nor has the court found, any indication in the treatment records that Plaintiff's weight was of serious concern to her physicians or that it affected her health or ability to perform work-related activities.[12] Likewise, in her brief before this court Plaintiff has failed to identify any additional limitations that are allegedly attributable to her obesity. Plaintiff has thus failed to carry her burden of presenting evidence demonstrating that her weight <u>significantly</u> limits her ability to do basic work activities or impairs her capacity to cope with the demands of working. *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a); *see also* <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 550 (3d Cir. 2004); <u>Salles</u>, 229 Fed. Appx. at 145; <u>Phillips v. Barhnart</u>, 357 F.3d 1232, 1237 (11th Cir. 2004); SSR 02-01p(6) ("no specific level of weight or BMI . . . equates with a 'severe' or a 'not severe' impairment"; to be severe, the obesity must, alone or in combination with another medically determinable physical or mental impairment, significantly limit physical or mental ability to do basic work activities). Plaintiff's mere citation to SSR 02-01p, for the vague proposition that obesity <u>may</u> cause various limitations in function in certain individuals (*see* Doc. 21 at 17), is insufficient to establish that <u>her</u> weight causes any such limitations. Accordingly, Plaintiff is not entitled to relief on this claim. For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

It is therefore respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

---

[12] To the extent such evidence exists and Plaintiff wished this court to consider it, Plaintiff was required to reference it in her brief (*see* Doc. 16 (Scheduling Order)).

At Pensacola, Florida this 20th day of December 2011.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* **28 U.S.C. § 636;** United States v. Roberts, **858 F.2d 698, 701 (11th Cir. 1988).**